**Murray ISRAEL, M.D., et al., Appellants,**

v.

**BAXTER LABORATORIES, INC., et al.**

**No. 24622.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1972.

Decided May 17, 1972.

As Amended Aug. 9, 1972.

---

Mr. Howard F. Cerny, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Matthew J. Faerber, Washington, D. C., was on the brief, for appellants.

Mr. Max O. Truitt, Jr., Washington, D. C., with whom Messrs. Henry T. Rathbun and Raymond C. Clevenger, III, Washington, D. C., were on the brief, for appellees Baxter Laboratories Inc. and Travenol Laboratories, Inc.

Mr. Julius A. Johnson, Asst. U. S. Atty., with whom Messrs. Thomas A.

Flannery, U. S. Atty., at the time the brief was filed, John A. Terry, Joseph M. Hannon and Robert S. Rankin, Jr., Asst. U. S. Attys., were on the brief, for appellee Finkel.

Before MacKINNON and WILKEY, Circuit Judges, and MATTHEWS,* Senior Judge, United States District Court for the District of Columbia.

WILKEY, Circuit Judge:

Plaintiffs seek damages and injunctive relief based on an alleged conspiracy by defendants in violation of federal and state antitrust laws. Essentially, they assert that the defendants conspired to keep plaintiffs' drug Cothyrobal off the interstate market and out of competition with Choloxin, a similar drug sold by defendants Baxter and Travenol, by influencing the Food and Drug Administration to deny fair consideration of the new drug applications filed by plaintiffs for Cothyrobal. The plaintiffs allege that defendants (who include an official of the FDA) carried out this conspiracy by suppressing, concealing and misconstruing information concerning the two drugs before the FDA; by arranging for the employment as a consultant to the FDA of a medical doctor who had a financial interest in Baxter, which was seeking approval of its own cholesterol-lowering drug Choloxin; by applying an unfair standard in judging Cothyrobal; and by misrepresenting the safety and efficacy of Cothyrobal.

I. *Procedural Background*

The plaintiff Vascular Pharmaceutical Company filed with the FDA a series of new drug applications for approval of interstate sale of Cothyrobal, followed either by withdrawal or abandonment of such applications before final agency action had taken place.

The first new drug application (No. 11–311) for Cothyrobal was filed by Vascular in 1960, but was withdrawn without prejudice to subsequent application. The next such filing (No. 13–118) in 1961 was found by the FDA to be incomplete. In rejoinder, Vascular requested a filing over protest and demanded a hearing, which the FDA granted. During the course of the hearing commencing 18 November 1963, Vascular agreed to provide certain minor information clarifying statements in the application, while the FDA promised to cooperate and consult on the application in order to expedite the clarification it had requested of Vascular. The hearing was thereupon terminated and Vascular withdrew its application. Shortly afterwards, Vascular submitted another new drug application (No. 15–497), containing what plaintiffs considered was the information the FDA had requested. In September 1964, however, the FDA revoked the investigational new drug exemption it had earlier granted Cothyrobal on the grounds that the drug was not clinically safe.

It was not until 8 January 1969 that the FDA finally announced that it proposed to disapprove the new drug application for Cothyrobal.[1] Plaintiffs protested this action and demanded a hearing. A pre-hearing conference was scheduled for 23 April 1969, with the hearing itself set for 19 May. However, on 22 April the plaintiffs withdrew their new drug application for Cothyrobal without prejudice to a subsequent filing. The Department of Health, Education and Welfare hearing examiner then entered an order dismissing the proceedings as moot on the basis of plaintiffs' withdrawal of their application.

Plaintiffs brought suit 6 July 1970 in United States District Court, charging the defendants with conspiring in violation of federal and state antitrust laws to keep Cothyrobal from being approved by the FDA for interstate sale, thereby favoring Choloxin, and seeking damages and injunctive relief. On motion of de-

---

* Sitting by designation pursuant to 28 U. S.C. § 294(c) (1970).

1. 34 Fed.Reg. 273.

fendants to dismiss or, in the alternative, for summary judgment [1a], the District Court dismissed the complaint, holding, first, that this case fell within the exemption from the antitrust laws enunciated in Eastern Railroad Presidents' Conference v. Noerr Motor Freight, Inc.,[2] and, second, that plaintiffs had not exhausted their administrative remedies. From this ruling plaintiffs appeal.

## II. Antitrust Exemption

The defendants contend that the *Noerr-Pennington* doctrine,[3] which exempts from the antitrust laws joint efforts to influence legislative or executive action, even when such efforts are designed to injure or eliminate competition, is applicable to the case at bar. They point out that the only conduct complained of is the defendants' alleged efforts to induce the FDA to withhold approval of a new drug application for Cothyrobal. This they submit is "restraining competition by inducing governmental action," protected by *Noerr-Pennington,* and not action effecting restraint "by defendants' own conduct," which is not protected.

■ It is clear that the protection from the antitrust laws afforded joint activity by the *Noerr-Pennington* doctrine is not unlimited. In *Noerr* the Supreme Court legitimatized under the Sherman Act joint efforts by businessmen to influence legislative or executive action, even if such efforts are designed to injure their competitors:

> A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them.[4]

In *Pennington,* involving a suit by a small mining company against larger ones and labor unions, alleging a conspiracy to influence the Secretary of Labor to set such high rates as to force the small company out of business, the Court followed its holding in *Noerr.* It found that "joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." [5]

The *Noerr-Pennington* doctrine was given its widest scope in United States v. Johns Manville Corporation.[6] The

---

1a. The motion for summary judgment by Dr. Finkel was based upon the contention that Dr. Finkel, the FDA medical officer and one of the defendants, was not subject to prosecution because of official immunity. The action of the District Judge in granting the motion to dismiss the case was based solely upon his construction of the applicable antitrust laws and his determination that plaintiffs had not exhausted their administrative remedies. In the posture of a motion to dismiss, the well pled allegation that Dr. Finkel was acting outside the scope of her authority must be taken as true. The action was thus dismissed on an independent ground, the trial court did not consider it necessary to reach the issue of Dr. Finkel's allegation of official immunity and, therefore, it is not before this Court on appeal. Upon remand defendant may reassert her claim of official immunity for consideration by the trial Court.

2. 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

3. *Id.,* and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

4. 365 U.S., at 139, 81 S.Ct., at 530–531.

5. 381 U.S., at 670, 85 S.Ct., at 1593.

6. 259 F.Supp. 440 (1966). Another more recent case brought to the court's attention by defendants also giving wide scope to the *Noerr-Pennington* doctrine is Semke v. Enid Automobile Dealers Association, 456 F.2d 1361 (10th Cir. 1972), involving successful efforts by members of an automobile dealers' association to persuade, *inter alia,* the executive director of the Oklahoma State Motor Vehicle Commission to seek an injunction, which was subsequently obtained, to restrain a used car dealer from selling new cars without a license (required under Oklahoma law). The Tenth Circuit sustained the trial

District Court for the Eastern District of Pennsylvania held that joint activities to influence the decisions of public procurement officials on product specifications in order to eliminate the products of competitors "are constitutionally protected and cannot be the basis of a finding of violation of the antitrust laws, . . . regardless of the intent with which they were undertaken."[7] The *Noerr-Pennington* doctrine was thus expanded to protect joint efforts to influence governmental actions as a purchaser in the market, not merely when acting in a sovereign legislative or regulatory capacity.

Thereafter, judicial encounters with *Noerr-Pennington* resulted in a narrowing of the doctrine's applicability. In George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,[8] presenting the same issue as in *Johns Manville, supra,* the First Circuit reached the opposite result. It held that joint efforts by the defendant Paddock and others to write the specifications for pipeless swimming pools bought by public agencies in such a way as to exclude competitors was not protected by *Noerr-Pennington:*

> The entire thrust of *Noerr* is aimed at insuring uninhibited access to government policy makers. . . . By "enforcement of laws" we understand some significant policy determination in the application of a statute, not a technical decision about the best kind

of weld to use in a swimming pool gutter.[9]

This court, in Hecht v. Pro-Football, Inc.,[10] took a similar approach to *Noerr-Pennington's* reach. We held the validity of a thirty-year exclusive lease between the District of Columbia Armory Board, an unincorporated instrumentality of the District of Columbia which operates Robert F. Kennedy Stadium, and Pro-Football, Inc., the corporate name of the Washington Redskins, was subject to the federal antitrust laws, and thus remanded the case for trial on the merits. The appellee Armory Board had asserted that the lease constituted "valid governmental action which is immune from the application of the antitrust laws." Relying on the First Circuit's decision in *Paddock Pool, supra,* and the Ninth Circuit's decision in Trucking Unlimited v. California Motor Transport Co., *infra,* we enunciated, at least partially, the limitations of *Noerr*:

> The court [of appeals] in *Trucking Unlimited* apparently considered that an adjudicative agency was in a position similar to a governmental agency charged with procurement, as in *Paddock Pool.* In neither case was the governmental agency in a position to make governmental policy, it was obligated to carry out the policy as already made, hence the rationale of *Noerr-Pennington,* guaranteeing access of private parties in combinations

---

court's holding that the defendants by invoking state action had acted validly and in accord with the *Noerr-Pennington* doctrine. After reviewing the recent decision of the Supreme Court in California Motor Transport Co. v. Trucking Unlimited, *infra,* note 20, the Tenth Circuit held that case inapposite to *Semke,* stating that "[California Motor Transport] does not aid the plaintiff at bar because it has not been shown here that defendants were guilty of fraud, corruption or misuse of the state processes." (At 1366).

As such, *Semke* differs from the case at bar in that the plaintiffs here assert that the defendants, who include an official of the FDA, in fact "misused" the FDA processes by influencing the agency to

deny fair consideration of the new drug application filed by plaintiffs for their drug Cothyrobal (See *supra* for a description of these allegations). In contrast, in *Semke* the defendants sought, albeit in their own interest, to have the Oklahoma statute requiring one who sells new cars in the state to obtain a license enforced against the plaintiff.

7. *Id.,* at 453; the Justice Department did not appeal the District Court's dismissal of Johns Manville's complaint.

8. 424 F.2d 25 (1970).

9. *Id.,* at 32.

10. 144 U.S.App.D.C. 56, 444 F.2d 931 (1971).

which would otherwise be illegal under the antitrust laws to influence such agency simply did not apply.

*Trucking Unlimited* illustrates again that the determination that a state agency and state action are involved "is only the beginning of the inquiry." In this category of joint efforts to secure governmental action . . . belongs, of course, Woods Exploration and Producing Co., Inc. v. Aluminum Company of America [*infra*]. . . .[11]

Perhaps the case involving an issue most similar to the one at bar is Woods Exploration and Producing Co., Inc. v. Aluminum Company of America,[12] in which plaintiffs alleged that two large-tract natural gas producers violated the antitrust laws by filing false nomination forecasts with the Texas Railroad Commission, which regulates the available amount of gas to be produced from each well or unitized tract, in order to reduce the production allowed others, especially small-tract producers.

This case is relied on by the defendants here for the result reached by the District Court on the merits, a grant of summary judgment for the defendants on the grounds that even wilful and fraudulent joint efforts to induce a governmental agency to arrive at an erroneous result cannot provide the basis for an antitrust action.[13] The District Court's judgment on the merits, however, was preceded by then District Judge Ingraham's denial in the same action [14] of defendants' motion, raising the *Noerr-Pennington* defense, to dismiss for failure to state a claim and in the alternative for summary judgment.[15]

Furthermore, the Fifth Circuit, in reviewing the decision of the District Court on the merits, reversed and carefully circumscribed the *Noerr-Pennington* doctrine:

Basic to *Noerr* is a belief that regulation of competition by the political process is legitimate and not proscribed by the Sherman Act, an enactment which is itself a political decision. For the political process itself to be effective there must be freedom of access, regardless of motive, to ensure the "right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws." . . . Where these political considerations are absent the *Noerr* doctrine is inapplicable. . . . The policies of the Sherman Act should not be sacrificed simply because defendants employ governmental processes to accomplish anti-competitive purposes. Otherwise, with governmental activities abounding about us, government could engineer many to antitrust havens.[16]

11. *Id.*, 144 U.S.App.D.C. at 67, 444 F.2d, at 942.

12. 438 F.2d 1286 (5th Cir. 1971).

13. 284 F.Supp. 582 (S.D.Tex.1968).

14. This cause of action was transferred from the court of then District Judge Ingraham to another District Judge as a docket equalization measure in 1966.

15. Judge Ingraham recognized the inapplicability of *Noerr* to the situation presented by *Woods Exploration:*
    [I]s the conduct complained of . . . political in nature? If the defendants were enjoined from conspiring to submit false nominations to the Railroad Commission would they be deprived of any Constitutional right to petition or participate in the Governmen-

tal process? The answer clearly seems to be that the defendants would only be prohibited from undertaking certain joint business behavior. To subject them to liability under the Sherman Act for conspiring to restrict production or to eliminate a competitor would effectuate the purposes of the Sherman Act and would not remotely infringe upon any of the constitutionally protected freedoms spoken of in *Noerr*.
36 F.R.D. 107, at 111–112.

16. 438 F.2d, at 1296–1297. See also J. Scott, Antitrust and Trade Regulation Today: 1969, 88 (1969) and S. Oppenheim and G. Weston, Federal Antitrust Laws—Cases and Comments, 160–162 (1968).

The Fifth Circuit went on to find "*Noerr-Pennington* inapplicable to the alleged filing of false nominations [since] this conduct was not action designed to influence policy, which is all the *Noerr-Pennington* rule seeks to protect." [17] It found that the "abuse" of the administrative process alleged by plaintiffs did not justify antitrust immunity.

■ The basic concern of the courts of appeal (and one District Judge) in both *Woods* and *Trucking Unlimited* may be deemed the integrity of the regulatory process.[18] No actions which impair the fair and impartial functioning of an administrative agency should be able to hide behind the cloak of an antitrust exemption.[19]

The *coup de grace* to defendants' arguments in the case at bar was administered 13 January 1972 by California Motor Transport Co. v. Trucking Unlimited,[20] in which the Supreme Court affirmed the Ninth Circuit's remand of the case for trial on plaintiffs' complaint of violations of the Sherman and Clayton Acts. The case involved joint efforts by certain large trucking firms to limit competition, resulting from relatively easy access to operating rights, by opposing the requests of smaller companies for certification by the California Public Utilities Commission and the Interstate Commerce Commission. The larger companies established a joint trust fund, sustained by monthly contributions based on each firm's gross income, to finance resistance to all applications filed by their competitors. The District Court dismissed the plaintiffs' complaint, but the Ninth Circuit reversed.

In agreeing with the result reached by the Ninth Circuit, the Supreme Court found that "on their face" plaintiffs' allegations came within the "sham" exception in *Noerr*. The Court recognized on the one hand that "it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of . . . federal agencies . . . to advocate their causes . . . respecting resolution of their business and economic interests *vis-à-vis* their competitors." [21] On the other

---

17. *Id.*, at 1298.

18. For an excellent discussion of *Woods Exploration* and *California Transport* prior to the Supreme Court decision in *California Transport, infra*, see Comment, "Antitrust Immunity: Recent Exceptions to the Noerr-Pennington Defense," 12 B.C.Ind. & Com.L.Rev. 1133 (1971).

19. The issuance of patents provides a close analogy to the approval of drugs by the FDA. In a recent commentary on the antitrust implications of issuing patents, Van Cise notes:
    Should the purpose of the applicant be to obtain a patent by fraud, . . . substantial antitrust issues may be raised. The main purpose of the applicant, then, would not be to disclose some new advance in science or the useful arts, but rather by deception to exclude others from access to a product or process which all should be free to enjoy. As pointed out in Walker Process Equipment, Inc. v. Food Machinery and Chemical Corporation, 382 U.S. 172 [86 S.Ct. 347, 15 L.Ed.2d 247] (1965): "Proof of this assertion would be suf-
    ficient to strip . . . [a patentee] of its exemption from the antitrust laws. . . . "
    . . . [A]n intent by a patent applicant through agreement to obtain a patent claim to which he might not be otherwise entitled could constitute an attempt to restrain or monopolize, not by reason of a reward from the Government for an advance in technology, but solely because of this agreement. As Mr. Justice White emphasized in his concurring opinion in United States v. Singer Manufacturing Company, 374 U.S. 174 [83 S.Ct. 1773, 10 L.Ed.2d 823] (1963), any such conduct would improperly subordinate, to private ends: "the public interest in granting patent monopolies only when the progress of the useful arts and of science will be furthered."
    Van Cise, "Patents, Plowshares and Pruning Hooks," 57 A.B.A.J. 1100, 1101 (1971).

20. 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

21. *Id.*, at 510–511, 92 S.Ct. at 612.

hand, the Court pointed to its earlier holding in *Noerr* to the effect that there may be situations in which an alleged conspiracy, "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." [22] The Court found the latter to characterize the situation presented in *California Transport* and ordered the case remanded to the District Court for trial. [23]

Plaintiffs in the case at bar allege that the real purpose of defendants' joint efforts is to preclude, not induce, fair FDA consideration of the safety and efficacy of plaintiffs' drug Cothyrobal for interstate sale, and as such should be viewed as falling within the "sham" exception to *Noerr-Pennington*. As the Court noted in *California Transport, supra,* "[w]hat the proof will show is not known, for the District Court granted the motion to dismiss the complaint. We must, of course, take the allegations of the complaint at face value for the purposes of that motion. [24]

Therefore, in a manner similar to the Fifth Circuit in *Woods Exploration, supra,* [25] we remand all issues to the District Court, with directions that it retain jurisdiction over the subject matter, but in turn, subject to plaintiffs reactivating their last-filed application for FDA approval of Cothyrobal, [26] remand the original question of the safety and efficacy of Cothyrobal for interstate sale to the Secretary of Health, Education and Welfare for initial determination on the merits. [27] This will provide the FDA with the opportunity of passing on plaintiffs' application first, which is appropriate in view of its primary jurisdiction over the approval of drugs for interstate sale, as discussed *infra*. It will not, however, deprive plaintiffs of the opportunity, if necessary, of attempting to prove their allegations of antitrust law violations and all matters related thereto at trial *de novo* before the District Court, as we explain *infra*. This is an opportunity they might not possess if the only review of an adverse

---

22. *Id.,* quoting 365 U.S., at 144, 81 S.Ct., at 533, 5 L.Ed.2d 464. The Court has elsewhere found that the use of a patent obtained by fraud to exclude a competitor from the market may involve an antitrust violation, Walker Process Equipment Inc. v. Food Machinery, 382 U.S. 172, 175–177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); and that conspiracy with a licensing authority to eliminate a competitor may also result in a violation of the antitrust laws, Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 707, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *see also* Harman v. Valley National Bank, 339 F.2d 564 (9th Cir. 1964).

23. Mr. Justice Stewart, with whom Mr. Justice Brennan joined, concurred in the result reached by the majority. He observed: "Under [their] allegations, liberally construed, the respondents are entitled to prove that the real *intent* of the conspirators was not to invoke the processes of the administrative agencies and courts, but to discourage and ultimately to prevent the respondents from invoking those processes. Such an intent would [come within the "sham" excep-

tion in *Noerr*]." *Id.,* at 518, 92 S.Ct. at 615 (emphasis in original).

24. *Id.,* at 515, 92 S.Ct. at 614.

25. The Fifth Circuit took, *inter alia,* the following step in that case: "[W]e reverse the grant of summary judgment and remand the issue [to the District Court] for an evidentiary determination of whether or not defendants in fact filed false nominations, and, if so, what damages plaintiffs sustained therefrom." 438 F.2d at 1298.

26. It is appropriate to have plaintiffs reactivate their last-filed application rather than file a new one, since their allegations of antitrust violations are made in reference to FDA treatment of their prior applications.

27. While Sections 505(c) and (d) of the Food, Drug and Cosmetic Act, 21 U.S.C. § 355(c), (d), as amended 1962, refer to the Secretary of Health, Education and Welfare rather than the Commissioner of Food and Drugs, all of the Secretary's powers and functions under the Act have been delegated to the Commissioner, 21 C.F.R. § 2.120(a).

FDA decision afforded them was that under Section 355(h) of the Federal Food, Drug and Cosmetic Act[28] or under Section 706(1) of the Administrative Procedure Act,[29] both of which permit appeals court review only to the extent of ascertaining whether the agency decision is supported by substantial evidence and not characterized by arbitrariness. Under the procedure we follow here there will be only one appellate review, on a complete record, and, if necessary, on both issues.

## III. *Primary Jurisdiction and Exhaustion of Administrative Remedies*

On remand, and subject to plaintiffs reactivating their last-filed application for FDA approval of Cothyrobal for interstate sale, the District Court will be confronted with two issues: (1) whether plaintiffs' drug Cothyrobal is safe and effective for interstate sale, and (2) whether plaintiffs' allegations as to the existence of a conspiracy on the part of defendants to prevent full and fair FDA consideration of plaintiffs' application for approval of Cothyrobal and thereby to favor defendants' drug Choloxin are true. These two questions appear to be inextricably linked insofar as portions of the evidence which may be offered; however, the decision on the first issue is most properly for the FDA, while decision on the second (antitrust) issue is reserved for the District Court.

The reason for affording the FDA the first opportunity to decide whether Cothyrobal is safe and effective for interstate sale is essentially practical: In view of the comprehensive scheme enacted by Congress for the testing of new drugs with respect to their safety and efficacy before they may be approved for interstate sale, and of the expertise required to conduct such tests, the question of the efficacy and safety of Cothyrobal is clearly inappropriate for original consideration by the courts. Plaintiffs themselves recognize this and do not dispute the primary jurisdiction of the FDA over such questions.[30] The Supreme Court has clarified the nature of primary jurisdiction:

The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and ad-

28. 21 U.S.C. § 355(h), as amended 1962, which provides in relevant part that "The finding of the Secretary [of Health, Education and Welfare] as to the facts, if supported by substantial evidence, shall be conclusive. If any person shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceeding before the Secretary, the court may order such additional evidence to be taken before the Secretary. . . ."

29. 5 U.S.C. § 706(1) (1966), which provides in relevant part that "The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; . . ."

30. "Appellants are not asking the District Court to do the administrative task of approving their application before the FDA, rather, they are asking the Court to hear and determine that there has been a conspiracy violating the normal administrative procedure, a conspiracy against the criminal laws of the United States, and to recognize and determine that because of this conspiracy there has been a restraint of trade in violation of the Antitrust laws of the United States." Original Brief for Plaintiffs-Appellants, pp. 31–32.
"In essence, then, Appellants would like to make perfectly clear to this Court, that they are not attempting to have the District Court do the FDA's job. Rather, they are trying to point up to this Court that the District Court failed to see the violation of the antitrust laws alleged, and let itself get side-tracked on the issue of exhaustion of administrative remedy. Once again, failure of the FDA to approve Cothyrobal is not the complaint; the complaint is, the conspiratorial activities of Appellees have been such as to violate the antitrust laws of the United States, and the several States, by keeping Cothyrobal off the market and out of competition with Choloxin. . . ." Reply Brief for Plaintiffs-Appellants, pp. 6–7.
*See also* Rutherford v. American Medical Ass'n, 379 F.2d 641 (7th Cir. 1967).

ministrative agencies charged with particular regulatory duties. *"Exhaustion"* applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. *"Primary jurisdiction,"* on the other hand, applies where a claim is originally cognizable in the courts, and comes into play *whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. . . .*[31]

■ Although plaintiffs' antitrust claims in the instant case are "originally cognizable in the courts," enforcement of these claims involves a determination of the safety and efficacy of Cothyrobal, that is, its fitness for interstate sale as defined by the requirements of the Food, Drug and Cosmetic Act, a function clearly within the "specific competence" of the FDA. As put by Professor Oppenheim, "The doctrine of primary jurisdiction . . . is in its strict sense a concept under which a plaintiff will be barred from proceeding in a lawsuit until all or some of the issues have been considered by the appropriate regulatory agency."[32] Only by adhering to such a procedure are the goals sought by the Supreme Court in

Far East Conference v. United States attainable

. . . *even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined.* Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.[33]

■ It is clear, then, that the doctrine of primary jurisdiction applies to particular issues in a judicial proceeding as well as to cases in which the entire cause of action is one within the primary jurisdiction of an administrative agency. As such, it is incumbent upon plaintiffs to resubmit to the FDA, *inter alia,* their last drug application for approval for interstate sale of their drug Cothyrobal. The record demonstrates, however, that they have never permitted full FDA consideration of the safety and efficacy of Cothyrobal; instead, while on several occasions initiating the procedure for FDA consideration of Cothyrobal, the plaintiffs then either withdrew or abandoned their applications before the FDA was able to make a final deter-

31. United States v. Western Pacific Railroad Co., 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (emphasis added); see also United States v. Chesapeake & Ohio Railway Co., 352 U.S. 77, 77 S.Ct. 172, 1 L.Ed.2d 140 (1956); Northwestern Auto Parts Co. v. Chicago, Burlington & Quincy Railroad Co., 240 F.2d 743 (8th Cir. 1957); Northern Pacific Railway Co. v. United States, 213 F.2d 366 (8th Cir. 1954).

32. S. Oppenheim & G. Weston, Federal Antitrust Laws—Cases and Comments 51 (1968).

33. Frankfurter, J., in 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576

(1952) (emphasis added). This is to be distinguished from the legal situation in Seatrain Lines, Inc. v. Federal Maritime Commission and United States of America, 148 U.S.App.D.C. 424, 460 F.2d 932 (1972), where the ground of our holding that the FMC lacked jurisdiction over the contract involved was the absence of the requisite statutory grant of authority, especially as viewed in the light of overall antitrust policy. Here there is no question raised as to the authority of the FDA to pass upon the drug, but FDA consideration is linked to plaintiffs' antitrust conspiracy allegations, clearly a matter ultimately cognizable by the District Court.

mination, a course of action for which there can now be no justification.

Furthermore, for plaintiffs in the case at bar to obtain the full relief they seek—injunctive relief restraining defendants from interfering with plaintiffs' efforts to market Cothyrobal and damages for injuries caused by an alleged conspiracy on the part of defendants in violation of the antitrust laws—they must in turn obtain the following: (1) FDA evaluation, in view of its primary jurisdiction, of the safety and efficacy of Cothyrobal for interstate sale; and (2) a District Court determination that the alleged conspiracy on the part of defendants actually existed. If, however, the District Court is not directed to retain jurisdiction over plaintiffs' antitrust law violations pending the FDA evaluation of Cothyrobal, plaintiffs may not be able to obtain the full relief they seek, since clearly the FDA is not vested with any expertise to determine the accuracy of plaintiffs' antitrust allegations, nor is it empowered to award damages in the event such allegations are shown to be correct.

In this respect, the case at bar is similar to Jewel Companies, Inc. v. FTC,[34] a suit to enjoin an investigation by the FTC, where the Seventh Circuit held that the District Court could retain jurisdiction to entertain a complaint challenging the FTC's jurisdiction, since if the Commission proceeded to a final order this question could not be raised on appeal from an agency determination.

### IV. *Future Proceedings*

Accordingly, the decision of the District Court is vacated and remanded, with directions that the District Court retain jurisdiction over the plaintiffs' cause of action, subject to plaintiffs reactivating their last-filed application for FDA approval of Cothyrobal, and subject also to any amendment of this application permitted by the FDA. If, however, plaintiffs do not then obtain full and fair consideration by the FDA as to the safety and efficacy of their drug Cothyrobal for interstate sale, they may obtain a full hearing in the District Court on all their allegations.[35]

The District Court should not be inhibited from considering the conclusions reached by the FDA with respect to the safety and efficacy of Cothyrobal for interstate sale in light of whatever showing plaintiffs make of the existence of a conspiracy, unfairness, or a conflict of interest on the part of defendants. The authority of the District Court to examine the findings of the FDA on a matter confided by Congress to the

---

34. 432 F.2d 1155 (7th Cir. 1970). One Commissioner, whose vote was necessary to the 3–2 decision to bring a complaint, voted for it on the stated theory he had no discretion to act otherwise. Similarly, on more than one occasion this court has reversed a trial court when the trial judge clearly indicated he had misconstrued the extent of his discretion. United States v. Waters, 141 U.S.App.D.C. 289, 437 F.2d 722 (1970) ; United States v. Ward, 147 U.S.App.D.C. 149, 454 F.2d 992 (1971).

35. Although we have spoken of a "full hearing" and a "trial *de novo*" in the District Court, if plaintiffs seek one after FDA final action occurs, the extent to which the parties introduce original evidence or rely upon the record made in the FDA proceeding rests largely in the good judgment of the District Court. The essential is that the plaintiffs have a full and fair presentation of all their contentions before an impartial tribunal.

As this court noted in a similar case: The District Court should retain jurisdiction of the antitrust suit while appellant seeks his remedies from the [Civil Aeronautics Board]. . . . The District Court . . . will have the benefit of these proceedings in determining the issue of antitrust violation. Whatever damages might ultimately be awarded by it would be damages for violation of the antitrust laws, not the Civil Aeronautics Act. Similarly, whatever injunctive relief is ultimately granted by the District Court with regard to matters determined by the Board to fall outside its jurisdiction would be under the antitrust laws, not the Civil Aeronautics Act.
S.S.W., Inc. v. Air Transport Ass'n of America, 89 U.S.App.D.C. 273, 280, 191 F.2d 658, 664 (1951) (footnote omitted).

FDA's expertise is derived from the court's authority in a case such as this to investigate plaintiffs' allegations of conspiracy and antitrust violations. It is distinct from appellate court review, which is usually confined to determining whether the agency's decision is supported by substantial evidence and that it is not the result of arbitrary procedure.

The knowledge that the ultimate FDA determination on the safety and efficacy of Cothyrobal for interstate sale may be subject to careful District Court scrutiny should not deter the FDA from making its customary thorough investigation of drugs submitted for approval for interstate sale. Rather, the FDA should be encouraged to make such a determination by personnel and standards which are unimpeachable.

So ordered.