600 F.2d 831
 195 U.S.App.D.C. 17
 EDISON PHARMACEUTICAL CO., INC., Petitioner,
v.
FOOD AND DRUG ADMINISTRATION, DEPARTMENT OF HEALTH,
EDUCATION, AND WELFARE, and Joseph A. Califano,
Secretary, Department of Health,
Education, and Welfare, Respondents.
 No. 77-1636.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 1, 1978.
Decided March 21, 1979.
 
 Howard F. Cerny, New York City, for petitioner.
 Margaret A. Cotter, Atty., Dept. of Justice, and Donald O. Beers, Asst. Chief Counsel, Food and Drug Administration, Rockville, Md., with whom Charles R. McConachie and James A. Calderwood, Attys., Dept. of Justice, and Richard M. Cooper, Chief Counsel, and Jeffrey B. Springer, Deputy Chief Counsel, Food and Drug Administration, Washington, D.C., were on the brief, for respondents.
 Before J. EDWARD LUMBARD, Senior Circuit Judge for the Second Circuit,* and TAMM and LEVENTHAL, Circuit Judges.
 Opinion for the court filed by TAMM, Circuit Judge.
 TAMM, Circuit Judge:
 
 
 1
 Petitioner, Edison Pharmaceutical Co., Inc. (Edison) seeks to set aside a final order[1] of the Commissioner of Food and Drugs (Commissioner) refusing approval of its new drug application (NDA) for the drug Cothyrobal.[2] Edison contends that the Commissioner's order is not supported by substantial evidence and that the Food and Drug Administration (FDA) failed to conduct a full and fair evidentiary hearing on all issues relevant to approvability of the NDA, as ordered by this court in Edison Pharmaceutical Co. v. FDA, 168 U.S.App.D.C. 273, 513 F.2d 1063, 1072 (1975). We conclude that Edison's contentions are without merit and accordingly, we affirm the Commissioner's order refusing approval of the NDA.
 
 I BACKGROUND
 
 2
 In the 1950's, Dr. Murray Israel developed Cothyrobal, an injectable drug[3] intended to treat hypercholesterolemia and hypothyroidism.[4] Cothyrobal is a combination of the thyroid extract, sodium levothyroxine, and cyanocobalamin (vitamin B 12). Levothyroxine is a cholesterol lowering substance with some toxic side effects. Proponents of Cothyrobal claim that vitamin B 12 inhibits the toxicity of levothyroxine while retaining its medicinal benefits. See Edison Pharmaceutical Co. v. FDA, 168 U.S.App.D.C. 273, 513 F.2d at 1066; 42 Fed.Reg. 28602-03 (1977).
 
 
 3
 In May 1969, Edison filed the NDA for Cothyrobal that is the subject of this appeal.[5] The Commissioner found the information offered in support of the application deficient under section 505(b) of the Federal Food, Drug and Cosmetic Act (Act), 21 U.S.C. § 355(b) (1976),[6] and denied the application in December 1969. Dr. Israel and Edison responded by filing an antitrust suit in the United States District Court for the District of Columbia alleging that an FDA consultant, an FDA employee, and manufacturers of a similar drug, Choloxin,[7] had conspired to prevent full and fair consideration of Edison's application by the FDA. The district court dismissed the suit,[8] but on appeal, this court reinstated the action.[9] See Israel v. Baxter Laboratories, Inc., 151 U.S.App.D.C. 101, 466 F.2d 272, 282 (1972).
 
 
 4
 After reinstatement of the antitrust suit, Edison requested reactivation of its NDA. Although Edison had an opportunity to supplement the NDA, it offered no additional information. The FDA reviewed Edison's NDA for the second time and again found it deficient. Edison responded by filing its application over protest. See 21 C.F.R. § 314.110(d), (e) (1978).[10] A third group of FDA personnel examined the NDA and concluded it could not be approved. See Edison Pharmaceutical Co. v. FDA, 168 U.S.App.D.C. 273, 513 F.2d at 1067; 38 Fed.Reg. 17027 (1973).
 
 
 5
 Edison then requested a hearing.[11] See 21 C.F.R. § 314.200(a)(2) (1978). The Commissioner concluded, Inter alia, that Edison had failed to set forth facts demonstrating the existence of a genuine and substantial issue of fact requiring a hearing on its NDA, See 21 C.F.R. § 314.200(g) (1978),[12] and denied the request. The basis for the Commissioner's decision was Edison's failure to submit double-blind controlled studies comparing the effects of Cothyrobal and levothyroxine[13] which he determined were necessary to prove the efficacy of the drug. Edison appealed that ruling to this court, contending that the studies it had submitted were as scientifically sound as humanly possible. See Edison Pharmaceutical Co. v. FDA, 168 U.S.App.D.C. 273, 513 F.2d at 1070-72. A panel of this court reversed and ordered the Commissioner to hold "a full evidentiary hearing" to determine whether double-blind testing comparing the effects of levothyroxine and Cothyrobal could be conducted safely and to determine "All relevant issues relating to the approvability of (Edison's) application."[14] Id. at 1071-72 (emphasis in original).
 
 
 6
 The FDA held the required hearings in December 1975 and January 1976. The administrative law judge (ALJ) concluded that limited double-blind testing could be performed safely. He further found that the studies submitted with the NDA failed to demonstrate the safety and efficacy of Cothyrobal, as required by section 505(d) of the Act, 21 U.S.C. § 355(d) (1976),[15] and that Edison had failed in a variety of ways to comply with statutes and regulations governing NDA approval. Accordingly, the ALJ refused approval of the NDA. See Joint Appendix (J.A.) at 8a-14a.
 
 
 7
 That decision was affirmed by the Commissioner on May 27, 1977. In a thorough opinion, See 42 Fed.Reg. 28602-23, the Commissioner reviewed the ALJ's decision and Edison's exceptions. The Commissioner concluded: (1) that double-blind control group testing comparing the effects of Cothyrobal and levothyroxine could safely and ethically be performed on non-cardiac patients after preliminary testing, that such double-blind testing could not safely be performed on cardiac patients, and that it would be unsafe and unethical to administer Cothyrobal to cardiac patients before testing with non-cardiac patients was complete; (2) that even if double-blind controlled testing could not be performed, Edison's NDA, as submitted, did not sufficiently prove the safety and efficacy of Cothyrobal, and failed to comply with various statutory and regulatory provisions; and (3) that the administrative hearing was complete and fair. Id. at 28607, 28622-23.
 
 
 8
 In this court, Edison contends (1) that the Commissioner's refusal of its NDA is not supported by substantial evidence, See 21 U.S.C. § 355(h) (1976); and (2) that the FDA failed to provide the full evidentiary hearing mandated in Edison Pharmaceutical Co. v. FDA, 168 U.S.App.D.C. 273, 513 F.2d 1063.
 
 II SUBSTANTIAL EVIDENCE
 
 9
 Before a new drug intended for human use[16] can be marketed in interstate commerce, it must be "clinically tested"[17] to establish it is both safe and effective. The Act requires an applicant to include reports of these tests in the NDA. 21 U.S.C. § 355(a), (b). NDAs must also contain certain technical information, See 21 U.S.C. § 355(b) (1976), and must be filed in accord with procedural specifications, See 21 C.F.R. § 314.1 (1978). The Commissioner concluded that Edison's NDA failed to demonstrate either the safety or efficacy of Cothyrobal. He further found that Edison had not complied with labeling specifications and rules requiring submission of samples and certain manufacturing information.
 
 A. Efficacy of Cothyrobal
 
 10
 Under section 505(d)(5) of the Act, 21 U.S.C. § 355(d)(5), an NDA must be denied if there is a lack of "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use" contained in the proposed labeling. Substantial evidence is "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved." 21 U.S.C. § 355(d). Uncontrolled studies or partially controlled studies alone are insufficient proof of a drug's efficacy. 21 C.F.R. § 314.111(a)(5)(ii)(C ) (1978). "Isolated case reports, random experience, and reports lacking details which permit scientific evaluation will not be considered." Id. An "adequate and well-controlled investigation," as defined in 21 C.F.R. § 314.111(a)(5)(ii)(A )(4 ) (1978),[18] is, Inter alia, one which "(p)rovides a comparison of the results of treatment or diagnosis with a control in such a fashion as to permit quantitative evaluation."
 
 
 11
 Clinically controlled testing usually involves administration of treatment to two groups of comparable subjects afflicted with the same condition. The first group receives the test drug; the second group, the control group, receives either an inactive preparation known as a placebo or a known drug to which the test drug is being compared.[19] The results of the two groups are then analyzed. Since human reaction to disease treatment may be influenced by a patient's expectations, and since observation of symptoms, particularly subjective symptoms, may be influenced by an observer's expectations, controlled investigations are usually conducted so neither subject nor observer knows which patient is receiving the test drug and which patient is part of the control group. This technique is called double-blinding. Double-blinding techniques[20] are generally required to assure the formation of a scientifically valid judgment as to the therapeutic efficacy of a particular treatment. See J.A. at 7a. In certain circumstances, however, such as those involving diseases with high and predictable mortality rates, or signs and symptoms of predictable duration or severity, the regulations permit the use of historical controls. 21 C.F.R. § 314.111(a)(5)(ii)(A )(4 )(Iv ) (1978). In an historically controlled study, the effects of the medication on a test population are compared with adequately documented accounts of the natural history of the disease instead of with control groups.
 
 
 12
 A double-blind controlled clinical investigation of Cothyrobal would require comparison of the effects of Cothyrobal with those of levothyroxine. Edison failed to perform such testing on the ground that the toxic effects of levothyroxine make it humanly impossible to administer the drug safely.[21] 42 Fed.Reg. 28604-05. Edison argues that use of historical controls is therefore appropriate.
 
 
 13
 1. Double-blind studies: The threshold question to be resolved by the Commissioner was whether double-blind controlled testing of Cothyrobal and levothyroxine is humanly possible. The Commissioner concluded that although it would be unethical to conduct this kind of study comparing two groups of cardiac patients, See id. at 28605 & n. 2, clinical tests comparing non-cardiac patients could be performed.[22] Id. at 28605-06. The Commissioner described this type of test as follows:
 
 
 14
 A double-blind test comparing a control group receiving oral thyroid medication plus a placebo injection, a control group receiving oral thyroid medication (See note 3 Supra ) plus the amount of levothyroxine in Cothyrobal and a treated group receiving oral thyroid medication plus Cothyrobal would be proper if non-cardiac young adults were used, if preliminary testing had shown that the cyanocobalamin component of Cothyrobal blocked thyrotoxic effects and if an acceptable theory were advanced to justify concurrent administration of oral thyroid and the levothyroxine in Cothyrobal.
 
 
 15
 42 Fed.Reg. 28622. The Commissioner further stated that ethically, Cothyrobal could not be administered to cardiac patients until concurrent controlled clinical tests with non-cardiac patients demonstrated the efficacy of the drug.
 
 
 16
 Dr. Israel, the developer of Cothyrobal and one of Edison's major witnesses, admitted that a study such as the one suggested by the Commissioner would be safe and ethical. See id. at 28606. Edison, nevertheless, challenges the Commissioner's conclusion primarily on the ground that this type of study "would not only fail to reveal anything relevant, but in this case the whole procedure would constitute an almost ludicrous circumvention of the issue." Brief in Support of Petition for Review to Set Aside the Final Order of the Food and Drug Administration (Brief for Petitioner) at 16. Edison apparently is arguing that because this testing would not indicate the effect of Cothyrobal on older cardiac patients, to whom the drug would most often be administered, it would be superfluous. See 42 Fed.Reg. 28606. We disagree.
 
 
 17
 This study would demonstrate the general efficacy of Cothyrobal in adding benefits to oral thyroid therapy alone. It would also show whether Cothyrobal has some effect greater than that which would be achieved by mere injection of one of its ingredients. See id. Adverse side effects, lesser in degree than cardiac arrest, See note 22 Supra, could also be discerned. We appreciate the Commissioner's concern about the potential danger of Cothyrobal use and cannot agree with Edison that the cautious step-by-step testing he suggests is either "ludicrous," irrelevant, or unsafe. See Brief for Petitioner at 16. Rather, we find the decision supported by substantial evidence and well within the Commissioner's authority. See Unimed Inc. v. Richardson, 147 U.S.App.D.C. 368, 458 F.2d 787, 789 (1972) (per curiam).
 
 
 18
 2. Edison's controls: Edison attempted to prove the efficacy of Cothyrobal through submission of studies it claims qualify as either clinically or historically controlled tests. In compliance with our mandate that the FDA hold a hearing and determine All issues relevant to the approvability of Edison's NDA, the Commissioner assumed arguendo that concurrent control group testing of Cothyrobal and levothyroxine was too dangerous to perform and examined each study submitted with the NDA to determine the approvability of the application. The Commissioner found these studies uniformly replete with inaccuracies and ambiguities, lacking protocol[23] and statistical analysis. Specifically, the Commissioner set out in detail the substantive deficiencies of each.[24] The Commissioner concluded, and we agree, that the studies were not "adequate and well-controlled" within the meaning of section 505(d) and did not establish the efficacy of Cothyrobal.
 
 
 19
 On appeal, Edison does not dispute the specific inadequacies of the studies found by the Commissioner. See note 24 Supra. Rather, it asserts that the FDA "ignored . . . (p)etitioner's long-term historical control," and "at no time . . . consider(ed) . . . (p)etitioner's study," Brief for Petitioner at 14, 16. The record belies Edison's contention.
 
 
 20
 The ALJ and the Commissioner both explicitly recognized the propriety of historical controls in certain circumstances, See J.A. at 10a; 42 Fed.Reg. at 28607, and carefully assessed Edison's studies against the appropriate standards, See J.A. at 10a-12a; 42 Fed.Reg. 28607-13. The ALJ and the Commissioner did not "ignore," the studies; they found them insufficient. In the absence of any argument that the Commissioner's specific findings of inadequacy are incorrect, we reject Edison's complaint. The Commissioner's decision that Edison's NDA failed to provide "substantial evidence" of efficacy in the form of either clinically or historically controlled studies is supported by substantial evidence. See 21 U.S.C. § 355(d)(5), (h).
 
 B. Safety of Cothyrobal
 
 21
 Section 505(d)(1) of the Act, 21 U.S.C. § 355(d)(1) (1976), requires that an NDA include "adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof." The Commissioner concluded that Edison failed to prove the safety of Cothyrobal. 42 Fed.Reg. 28613. The Commissioner noted that Edison's own attempt to avoid the usual double-blind studies places the safety of the Cothyrobal in question. Because Edison argues that the toxic effects of levothyroxine make it humanly impossible to administer that drug in controlled testing, patients receiving Cothyrobal may be subject to the same risks as those receiving levothyroxine, absent a showing of the claimed ability of vitamin B 12 to mitigate the antithyrotoxic effects of levothyroxine. See id.
 
 
 22
 Although the Commissioner recognized that studies showing the safety of a drug need not be adequate and well-controlled within the meaning of 21 C.F.R. § 314.111(a)(5), Compare 21 U.S.C. § 355(d)(1) With 21 U.S.C. § 355(d)(5), he properly ruled that they "must be adequately constructed so that scientists can draw reasonable conclusions from them." 42 Fed.Reg. 28614. The Commissioner, relying on testimony of three expert witnesses, concluded that both the animal studies and clinical testing offered by Edison were deficient and failed to demonstrate the safety of Cothyrobal.[25] Id. In addition, a number of witnesses, including some called by Edison, testified to adverse side effects, such as tachycardia[26] and insomnia, which may have resulted from treatment with Cothyrobal. Id. Edison failed to rebut this evidence. The Commissioner therefore concluded that Edison did not carry its burden of proving the safety of the drug. See Edison Pharmaceutical Co. v. FDA, 168 U.S.App.D.C. 273, 513 F.2d at 1065. In view of the foregoing, we find the Commissioner's decision supported by substantial evidence.
 
 
 23
 C. Manufacturing Data, Samples Submitted, and Proposed Labeling
 
 
 24
 The Commissioner found that Edison failed to comply with statutory provisions and regulations governing the manufacturing, sampling, and labeling of Cothyrobal. 42 Fed.Reg. 28614-15. Edison did not provide a description of the sampling methods used in the manufacturing process, as required by 21 C.F.R. § 314.1(c)(2)8d (1978). See 21 U.S.C. § 355(b)(4), (d)(5). Under 21 C.F.R. § 314.1(c)(2)8f (1978), the applicant must provide signed statements from each outside firm performing various parts of the manufacturing process. See 21 U.S.C. § 355(b)(4), (d)(3). Edison failed to submit this information. Adequate information on the characteristics and test methods used for the container, closure, and other component parts of the drug package was not submitted as required by 21 C.F.R. § 314.1(c)(2)8i (1978). See 21 U.S.C. § 355(b)(4), (d)(3). Samples of the drug were not submitted in conformity with the requirements under 21 C.F.R. § 314.1(c)(2)9 (1978). The drug label lacked the standard warning prohibiting dispensing without a prescription, as required by 21 U.S.C. §§ 321(k), 353(b)(4), 355(d)(6) (1976), and 21 C.F.R. § 1.20 (1978). Finally, information on the stability of the drug was insufficient under the standards set forth in 21 C.F.R. § 314.1(c)(2)8p (1978). See 21 U.S.C. § 355(b)(4), (d)(3).
 
 
 25
 Edison does not challenge these findings on appeal. As the Commissioner noted in his opinion, although each of these deficiencies can be remedied with a minimum of effort, Edison's failure to comply with statutory and regulatory provisions rendered the NDA unapprovable. 42 Fed.Reg. 28615.
 
 III THE HEARING
 
 26
 Edison contends that the evidentiary hearing on its NDA was neither complete nor fair. We have reviewed Edison's numerous complaints and find them all without merit. Only three warrant comment.[27]
 
 
 27
 Edison argues that the "myopically restrictive rulings of the FDA," Brief for Petitioner at 19, resulted in the improper exclusion of evidence that it contends constitutes the very "substantial evidence" necessary to approve the NDA. Edison primarily attacks rulings by the ALJ excluding evidence of tests not submitted with the NDA and "testimonial" evidence. Edison also objects to the exclusion of evidence of the FDA's treatment of the similar drug Choloxin[28] which it alleges was appreciably more favorable than the treatment accorded Cothyrobal. The Commissioner approved each of these exclusions.[29] 42 Fed.Reg. 28616-17, 28621.
 
 
 28
 The statutory scheme of the Act contemplates that a new drug will be approved or disapproved on the basis of the scientific tests contained in the NDA. See USV Pharmaceutical Corp. v. Secretary of Health, Education & Welfare, 151 U.S.App.D.C. 284, 466 F.2d 455, 456-57 (1972). The hearing offers an opportunity to test the strength and credibility of this material. Cf. Upjohn Co. v. Finch, 422 F.2d 944, 955 (6th Cir. 1970) ("No amount of examination and cross-examination can change the scientific studies and the data reported into something they are not.") The applicant may present testimony or evidence at the hearing to show that the studies and data submitted with the NDA in fact constitute the "adequate tests," 21 U.S.C. § 355(d)(1) and "substantial evidence," 21 U.S.C. § 355(d)(5), necessary for NDA approval. See generally Cooper Laboratories, Inc. v. FDA, 163 U.S.App.D.C. 212, 501 F.2d 772, 792 (1974) (Leventhal, J., dissenting); CIBA-Geigy Corp. v. Richardson, 446 F.2d 466, 468 (2d Cir. 1971) (per curiam). The applicant cannot, however, submit new studies at the hearing to be considered in the first instance by the ALJ. To do so would effectively shield an applicant's data from the initial scrutiny of FDA staff experts contemplated by section 505 of the Act, 21 U.S.C. § 355.
 
 
 29
 The regulations provide a procedure for the filing of new studies consistent with the statutory scheme. An applicant may supplement an NDA under submission pursuant to the procedures set out in 21 C.F.R. § 314.6 (1978). Edison failed to invoke this provision and, absent unusual circumstances, cannot now be heard to complain. If Edison were able to surmount all the other difficulties identified by the FDA, it would be free to seek consideration of another NDA containing the new tests it sought to introduce at the hearing.
 
 
 30
 Edison next objects to the exclusion of testimonial evidence which it alleges demonstrates the efficacy of Cothyrobal. Edison argues that because the symptoms of hypothyroidism are difficult to recognize, efficacy can be assessed most accurately through the degree of relief experienced by the patients. Brief for Petitioner at 12-14, 19. Thus, according to Edison, the " best way" to prove that the drug works "is to bring the patients in themselves" and allow them to testify. Id. at Addendum 11, 13.
 
 
 31
 Similarly, Edison contends that the most relevant expert testimony is that of doctors who have administered Cothyrobal and can relate their clinical impressions of the ability of the drug to relieve pain. Id. at 12-16. Edison, therefore, characterizes the testimony of non-clinical FDA experts,[30] despite their impressive credentials and scientific experience, See 42 Fed.Reg. 28603, as "meaningless," Brief for Petitioners at 14, and suggests that the ALJ erred when he considered their criticisms of the studies submitted with the NDA.
 
 
 32
 Edison's attempt to replace evidence of "controlled" investigation with testimony relating personal experiences or clinical impressions is inconsistent with the Act, the accompanying regulations, and explicit Supreme Court precedent, See Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 619, 630, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). As we previously have explained, section 505(d)(5) of the Act, 21 U.S.C. § 355(d), requires "substantial evidence," consisting of well-controlled scientific testing, to prove that a drug is effective. "Isolated case reports, random experience, and reports lacking the details which permit scientific evaluation" are not to be considered. 21 C.F.R. § 314.111(a)(5)(ii)(C ). The "substantial evidence" requirement responds to the need for "an Objective determination of efficacy of the drug products placed on the market," S.Rep.No. 448, 87th Cong., 1st Sess. 187 (1961) (emphasis added); See S.Rep.No. 1744, 87th Cong., 2d Sess. 11, 15-16 (1962), U.S.Code Cong. & Admin.News, 1962, p. 2884, and as the Supreme Court made clear in Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. at 630, 93 S.Ct. at 2483, "the test (is) a rigorous one."
 
 
 33
 Personal testimonials simply do not meet the exacting standards required by the Act and the regulations. The Court explained that the statutory and regulatory criteria
 
 
 34
 express well-established principles of scientific investigation. Moreover, their strict and demanding standards, barring anecdotal evidence indicating that doctors "believe" in the efficacy of a drug, are amply justified by the legislative history. The hearings underlying the 1962 Act show a marked concern that impressions or beliefs of physicians, no matter how fervently held, are treacherous.
 
 
 35
 Id. at 619 (footnote omitted). Subjective evaluations by selected patients are even more suspect. We therefore conclude that the ALJ's rulings excluding personal testimonials accord with applicable law. See Cooper Laboratories, Inc. v. FDA, 163 U.S.App.D.C. 212, 501 F.2d at 778-79; Pharmaceutical Manufacturers Association v. Richardson, 318 F.Supp. 301, 306-10 (D.Del.1970). We further find the admission of non-clinical FDA expert testimony entirely proper.
 
 
 36
 Edison also attempted to introduce evidence of the allegedly different treatment rendered by the FDA to the drug Choloxin. The ALJ properly excluded this evidence as irrelevant. Edison's failure to meet the specific statutory requirements governing NDA approval cannot be excused on the basis of prior action with regard to another drug. Cf. Chem-Haulers, Inc. v. ICC,565 F.2d 728, 730 (D.C. Cir. 1977) ("The mere fact that the Commission may have nodded on one occasion does not entitle a litigant to a repetition of its blunder."); Texas International Airlines v. CAB, 147 U.S.App.D.C. 363, 458 F.2d 782, 785 (1971) ("Assuming that the Government made a mistake as to (another) in the application of (a) regulation, the law does not require the Government to perpetuate the mistake.").
 
 IV CONCLUSION
 
 37
 For the foregoing reasons we find that substantial evidence supports the Commissioner's conclusions that double-blind testing of Cothyrobal humanly may be performed on non-cardiac patients and is necessary before the drug can be administered to cardiac patients, that Edison's NDA falls far short of congressionally prescribed standards governing approval, and that Edison was afforded a full and fair hearing. Accordingly, we affirm the FDA's refusal to approve Edison's NDA for Cothyrobal and finally put this "balky case," Edison Pharmaceutical Co. v. FDA, 168 U.S.App.D.C. 273, 517 F.2d 164, 167 (1975), to rest.
 
 
 38
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 Cothyrobal; Refusal to Approve New Drug Application, dated May 27, 1977, and published in the Federal Register on June 3, 1977 (42 Fed.Reg. 28602-23)
 
 
 [2]
 This drug is also known as "Co-Thyro-Bal."
 
 
 [3]
 Cothyrobal is intended to be used in conjunction with oral thyroid medication
 
 
 [4]
 Cothyrobal is recommended for treating hypercholesterolemia (excess of cholesterol in blood) in euthyroid patients (patients with a normally functioning thyroid gland) with or without organic heart disease and for treating hypothyroidism (the condition resulting from a deficiency in thyroid activity) in patients with or without cardiac disease who become thyrotoxic (exhibit adverse effects caused by thyroid hormone) with other types of thyroid medication. 42 Fed.Reg. 28603 (1977)
 
 
 [5]
 Various sponsors of Cothyrobal have filed three separate NDAs, unrelated to the present one, with the Food and Drug Administration (FDA). All have been either denied or withdrawn. See 40 Fed.Reg. 51490 (1975)
 
 
 [6]
 21 U.S.C. § 355(b) (1976) provides:
 Any person may file with the Secretary an application with respect to any drug subject to the provisions of subsection (a) of this section. Such person shall submit to the Secretary as a part of the application (1) full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use; (2) a full list of the articles used as components of such drug; (3) a full statement of the composition of such drug; (4) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug; (5) such samples of such drug and of the articles used as components thereof as the Secretary may require; and (6) specimens of the labeling proposed to be used for such drug.
 
 
 [7]
 Choloxin is a cholesterol lowering drug much like Cothyrobal
 
 
 [8]
 The district court dismissed the action on two grounds. First, the court ruled that the suit fell within the Noerr-Pennington doctrine which exempts from the antitrust laws joint efforts to influence legislative or executive action, even when such efforts are designed to injure or eliminate competition. See United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Second, the court held that plaintiffs had failed to exhaust their administrative remedies. See Israel v. Baxter Laboratories, Inc., 151 U.S.App.D.C. 101, 466 F.2d 272, 274-75 (1972)
 
 
 [9]
 This court concluded that the alleged wrongful conduct could be deemed within the "sham exception" to the Noerr-Pennington doctrine. See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). We directed the district court to remand the question of safety and efficacy of Cothyrobal to the FDA, in view of the agency's primary jurisdiction, but to retain jurisdiction so as to afford the plaintiffs a full hearing if they did not obtain full and fair consideration by the FDA. Israel v. Baxter Laboratories, Inc., 151 U.S.App.D.C. 101, 466 F.2d at 279-82
 
 
 [10]
 21 C.F.R. § 314.110 in pertinent part provides:
 (d) If an applicant disputes the finding that his application is incomplete or inadequate and, therefore, may not be filed, he may, instead of submitting additional data, make written request that the previously submitted application be filed over protest. . . .
 (e) Upon receipt of a written request to file an application over protest, the Food and Drug Administration shall consider the application filed and shall reevaluate the application. Within 90 days of the date of receipt of such written request by the Assistant Director for Regulatory Affairs, or such additional period as may be agreed upon by the parties, the application shall be approved, or the applicant shall be given written notice of an opportunity for a hearing pursuant to § 314.200 on the question of whether there are grounds for denying approval pursuant to section 505(d) of the act.
 
 
 [11]
 Edward Ford, a member of the Board of Directors of the Vascular Research Foundation, also requested a hearing on behalf of himself and approximately 200 other individuals. Joint Appendix at 17a
 
 
 [12]
 21 C.F.R. § 314.200(g) (1978) provides:
 A request for a hearing may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine and substantial issue of fact that requires a hearing with respect to the particular drug product(s) specified in the request for hearing.
 
 
 [13]
 See text Infra at 836
 
 
 [14]
 Although five judges of this court were concerned about the future effects of the panel's opinion, this court denied the FDA's suggestion for rehearing en banc because this is "a unique case" with "special facts and history." Edison Pharmaceutical Co. v. FDA, 168 U.S.App.D.C. 273, 517 F.2d 164, 165 (1975)
 
 
 [15]
 Section 505(d) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(d) (1976), provides:
 If the Secretary finds . . . that (1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b) of this section do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions; or (5) evaluated on the basis of the information submitted to him as part of the application and any other information before him with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof; . . . he shall issue an order refusing to approve the application. . . . As used in this subsection . . . the term "substantial evidence" means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.
 
 
 [16]
 Contrary to Edison's assertions, See Brief in Support of Petition for Review to Set Aside the Final Order of the Food and Drug Administration at 16-17, Cothyrobal, although composed of levothyroxine and vitamin B 12, neither of which is "new," qualifies as a new drug under 21 C.F.R. § 310.3(h) (1978). In pertinent part, section 310.3(h) provides:
 The newness of a drug may arise by reason (among other reasons) of:
 (1) The newness for drug use of any substance which composes such drug, in whole or in part, whether it be an active substance or a menstruum, excipient, carrier, coating, or other component.
 (2) The newness for a drug use of a combination of two or more substances, none of which is a new drug.
 (5) The newness of a dosage, or method or duration of administration of application, or other condition of use prescribed, recommended, or suggested in the labeling of such drug, even though such drug, when used in other dosage, or other method or duration of administration or application, or different condition, is not a new drug.
 
 
 [17]
 Clinically tested means tested in human beings. 42 Fed.Reg. 28604 (1977)
 
 
 [18]
 21 C.F.R. § 314.111(a)(5)(ii) provides:
 The following principles have been developed over a period of years and are recognized by the scientific community as the essentials of adequate and well-controlled clinical investigations. They provide the basis for the determination whether there is "substantial evidence" to support the claims of effectiveness for "new drugs" and antibiotic drugs.
 (A ) The plan or protocol for the study and the report of the results of the effectiveness study must include the following:
 (1 ) A clear statement of the objectives of the study,
 (2 ) A method of selection of the subjects that (I ) Provides adequate assurance that they are suitable for the purposes of the study, diagnostic criteria of the condition to be treated or diagnosed, confirmatory laboratory tests where appropriate, and, in the case of prophylactic agents, evidence of susceptibility and exposure to the condition against which prophylaxis is desired.
 (Ii ) Assigns the subjects to test groups in such a way as to minimize bias.
 (Iii ) Assures comparability in test and control groups of pertinent variables, such as age, sex, severity, or duration of disease, and use of drugs other than the test drug.
 (3 ) Explains the methods of observation and recording of results, including the variables measured, quantitation, assessment of any subject's response, and steps taken to minimize bias on the part of the subject and observer.
 (4 ) Provides a comparison of the results of treatment or diagnosis with a control in such a fashion as to permit quantitative evaluation. The precise nature of the control must be stated and an explanation given of the methods used to minimize bias on the part of the observers and the analysts of the data. Level and methods of "blinding," if used, are to be documented. Generally, four types of comparison are recognized:
 (I ) No treatment: Where objective measurements of effectiveness are available and placebo effect is negligible, comparison of the objective results in comparable groups of treated and untreated patients.
 (Ii ) Placebo control: Comparison of the results of use of the new drug entity with an inactive preparation designed to resemble the test drug as far as possible.
 (Iii ) Active treatment control: An effective regimen of therapy may be used for comparison, e. g., where the condition treated is such that no treatment or administration of a placebo would be contrary to the interest of the patient.
 (Iv ) Historical control: In certain circumstances, such as those involving diseases with high and predictable mortality (acute leukemia of childhood), with signs and symptoms of predictable duration or severity (fever in certain infections), or in case of prophylaxis, where morbidity is predictable, the results of use of a new drug entity may be compared quantitatively with prior experience historically derived from the adequately documented natural history of the disease or condition in comparable patients or populations with no treatment or with a regimen (therapeutic, diagnostic, prophylactic) the effectiveness of which is established.
 (5 ) A summary of the methods of analysis and an evaluation of data derived from the study, including any appropriate statistical methods.
 (C ) Uncontrolled studies or partially controlled studies are not acceptable as the sole basis for the approval of claims of effectiveness. Such studies, carefully conducted and documented, may provide corroborative support of well-controlled studies regarding efficacy and may yield valuable data regarding safety of the test drug. Such studies will be considered on their merits in the light of the principles listed here, with the exception of the requirement for the comparison of the treated subjects with controls. Isolated case reports, random experience, and reports lacking the details which permit scientific evaluation will not be considered.
 
 
 [19]
 The control group may also receive no treatment at all
 
 
 [20]
 A clinical study may also be single-blinded. The patient would be unaware of the medication he was receiving, but the investigators involved in the study would know which treatments were being administered to which patients
 
 
 [21]
 The relevant control group for a clinical test of Cothyrobal would be composed of individuals afflicted with hypercholesterolemia and hypothyroidism. Since these patients would also be taking oral thyroid, See note 3 Supra, the amount of levothyroxine received by a control group would equal the sum of levothyroxine in Cothyrobal And the oral thyroid. Edison claims This amount of thyroid extract would be toxic
 
 
 [22]
 Too high a dosage of thyroid medication is likely to cause heart failure in cardiac patients. The danger does not appear likely in non-cardiac patients. 42 Fed.Reg. 28606
 
 
 [23]
 Protocol is an outline of an experimental plan. It is formulated prior to the experiment and discusses the objectives of the study and the procedures to be used. It contains information necessary to accurately evaluate the experiment. See 42 Fed.Reg. 28608. Protocol is an essential element of an adequate and well-controlled study. 21 C.F.R. § 314.111(a)(5)(ii)(A )
 
 
 [24]
 The major deficiencies of the five studies are briefly as follows:
 The Israel Study lacked protocol, failed to provide diagnostic criteria demonstrating that the high cholesterol levels of the subjects selected were in fact due to hypocholesterolemia in euthyroid patients, and evinces bias by presenting data on only a portion of the patients, without setting out criteria justifying the selection. Most importantly, Dr. Israel used the patients themselves as controls, comparing pretreatment history with the effects of Cothyrobal treatment; yet he failed to control all other pertinent variables, E. g., diet, weather, emotional stress, which also change cholesterol levels. Results were primarily recorded on the basis of the subjective evaluation of Dr. Israel, and data was not statistically analyzed. 42 Fed.Reg. 28608-09.
 The Brusch Study lacked protocol and statistical evaluation. Several different treatments were rendered simultaneously, making it impossible to infer the therapeutic effect, if any, attributable to Cothyrobal. Id. at 28609-10.
 The Russek Study was detailed in a one-page abstract submitted with the NDA. There was no protocol. The report of the study contained numerous unexplained ambiguities. Since all patients were euthyroid, the study was not probative of the effect of Cothyrobal on hypothyroidism. By Dr. Israel's own admission, the paucity of information presented in the report precluded a determination that it was adequate and well-controlled. Id. at 28610-11.
 The Walczak Study, a one-page report of Dr. Walczak's experience with thyroid-vitamin therapy, lacked protocol and statistical analysis. Cothyrobal was administered to a wide variety of heterogeneous patients with differing diagnoses, some of whom were also receiving other treatments. There was no control group. Like Dr. Israel, Dr. Walczak attempted to use pretreatment history comparison as a control. He too, however, failed to control other pertinent variables. Id. at 28611-12.
 The Wren Study, although deficient in several respects, was the closest to an adequate and well-controlled investigation. Ironically, that study concluded that Cothyrobal had no significant effect. Id. at 28612-13.
 Edison also submitted a study on diabetic retinopathy. Among other deficiencies which are set out in the Commissioner's order, the patient population of the study is manifestly unsuitable. See id. at 28612.
 
 
 [25]
 The Commissioner ruled that the reports of animal studies done with vitamin B 12 did not provide a sufficient basis for a conclusion that the vitamin controlled the toxic effect of thyroid extract. Edison's clinical studies were rejected for reasons such as the low number of subjects, possibility of bias, failure to take account of variables and other inadequate uses of controls. Id. at 28614 (1976)
 
 
 [26]
 Tachycardia is a condition characterized by unusually rapid heart action
 
 
 [27]
 With respect to those objections that we do not discuss, we agree with the Commissioner's reasons for rejecting them
 
 
 [28]
 See text at 834-835 & nn. 7-9
 
 
 [29]
 The Commissioner evaluated all of Edison's exclusionary complaints against the statutory standards set out in section 7(c) of the Administrative Procedure Act, 5 U.S.C. § 556(d) (1976), and determined that the ALJ had properly excluded the evidence. Section 7(c) states that "the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence." Section 7(b)(3) of the Administrative Procedure Act, 5 U.S.C. § 556(c)(3) (1976), gives the agency employee presiding at the hearing the power to "rule on offers of proof and receive relevant evidence."
 
 
 [30]
 Clinical experts are those who observe and treat patients. Non-clinical experts, by comparison, concentrate primarily on technical and laboratory research